Filed 8/1/16  In re Y.G. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Y.G., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent, v. R.G., Defendant and Appellant. | G052993 (Super. Ct. No. DP024645) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Dennis J. Keough, Judge.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, and Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\* \* \*

R.G. (Mother) appeals from the juvenile court's termination of her parental rights to her now five-year-old daughter, Y.G.,[1] at the permanency placement hearing. (Welf. & Inst. Code, § 366.26, all further statutory references are to the Welfare and Institutions Code.) Mother maintains the court erred by finding the section 366.26, subdivision (c)(1)(B)(i), parental bond exception did not apply to avoid termination of parental rights. After failing to reunify with Y.G. after 18 months, Mother maintains Y.G.'s "primary attachment is to her" and the minor should not be adopted by the family she has also bonded with. She suggests a permanent plan of legal guardianship would be appropriate.

On November 23, 2015, this Court denied Father's writ petition challenging the denial of his section 388 petition. (*S.S. v. Superior Court* (Nov. 23, 2015, G052432) [nonpub. opn.].) He is not a party to this appeal. We find Mother's contentions on appeal lack merit, and we affirm the judgment.

I

We incorporate by reference our prior summary of facts through the 18-month review hearing ending on August 12, 2015, at which the juvenile court terminated reunification services and set a permanency hearing. (*S.S. v. Superior Court*, *supra,* G052432.) We will highlight below only the facts relevant to the single issue raised in this appeal.

In February 2014, then four-year-old Y.G. was taken into protective custody due to Mother's mental health problems, substance abuse, and neglect. Mother

---

[1] In the record and briefing, Y.G. is sometimes referred to as Y.S. For consistency and clarity, we will refer to the minor as Y.G. in this opinion.

2

suffered from panic attacks in which she would hit and cut herself. When she became angry and jealous of Y.G., she gave the child twice the recommended dosage of ibuprofen. She hit and neglected Y.G., and claimed she had once tried to give Y.G. bleach to drink. Mother suffered from depression, had multiple suicide attempts, and had a history of substance abuse, including alcohol, methamphetamine, and cocaine. Mother did not want to care for Y.G. and said she feared she would hurt the child. Mother said she did not know why she hit Y.G., but she also stated that sometimes when she was having a bad day she did not want Y.G. to make noise or talk and she would hit or yell at the child when she made sounds. One morning, Y.G. tried to wake up Mother, and Mother responded by slapping Y.G.'s face, causing her nose to bleed. Mother admitted she needed help, she would keep on hurting Y.G., and she could no longer take care of Y.G.

Y.G. was afraid of Mother. Mother said she knew Y.G. feared her because whenever she called for Y.G., she would start crying and pull away from her. Mother stated this occurred three to four times a week. Mother stated she "'gave up'" Y.G. and asked for help because "she was being abused emotionally by me, because I was taking the medications. I know she is hurt emotionally."

Y.G. was placed in a foster home, where she has remained throughout these proceedings. In the March 2014 reports for the jurisdiction and disposition hearing, the social worker reported Y.G. was adjusting to her placement but was very shy and would withdraw from anyone she did not know. She refused to communicate with the social worker, or even with the foster parents in the social worker's presence, and when she did communicate, it was only with "pure sounds" instead of verbal communication. The foster parents were concerned Y.G. would "'shut[] down' when redirected." They reported that once Y.G. took a plastic toy knife and simulated cutting herself. Another time, when another child was upset, Y.G. asked the child if he was going to kill himself.

3

Y.G. would cry when Mother would leave after their initial visits. Y.G. was referred to counseling.

On March 26, 2014, Mother pleaded no contest to the petition that alleged jurisdiction due to her failure to protect. (§ 300, subd. (b).) The juvenile court sustained the allegations of the petition, declared Y.G. a dependent child, removed her from parental custody, ordered reunification services for Mother, and set a six-month review hearing.

During the first six months of these dependency proceedings, Y.G. was doing well in therapy and thriving in her foster home. Y.G.'s initial developmental screening showed her to be "close to the cut-off on gross motor, fine motor, and personal social areas." The foster parents were interested in adopting Y.G. Mother made moderate progress with her case plan, and the social worker recommended she continue to receive reunification services. The parties stipulated to the juvenile court's order that services continue. The court set the 12-month review hearing for March 2015.

Mother's progress with her case plan was minimal over the next six months, and the social worker recommended terminating reunification services and setting a permanency hearing. Mother was terminated from therapy with a guarded prognosis because of missed appointments. She missed several drug tests, or tested positive for opiates and amphetamines. She frequently missed, or arrived late, for visits with Y.G. Y.G. resisted going to visits with Mother and said she wanted to stay with the foster parents.

Y.G. was thriving with her foster parents and she described her happiness on a scale of one to 10—with 10 being highest—as a 10. She referred to the foster parents as "Mommy and Daddy." Although she was still very shy, Y.G. was meeting all her goals in therapy, had greatly reduced her "shutdown" episodes, was doing very well in prekindergarten, and had made great improvements in her verbal skills. The foster parents were committed to caring for Y.G. and providing her a stable and loving home.

4

The 12-month review hearing was continued to April 15, 2015. The social worker's addendum report continued to recommend terminating Mother's services. Mother continued to visit Y.G., but was almost always late. She missed more drug tests and more therapy appointments. The 12-month review hearing was continued to May 6, 2015. The social worker's report for that hearing stated Mother's compliance with her case plan remained the same. Y.G. was attached to the foster parents, expressed her desire to remain with them, and became upset after visits with Mother. Nguyen reported that when she asked Y.G. if she had any concerns, Y.G. replied, "'I am worried I have to live with my Mom.'" She added, "'I want to stay with Mommy and Daddy [and the other members of the foster family].'" Nguyen and the foster mother "exchanged strategies to help [Y.G.] cope with her anxiety" about returning to Mother's care.

Up to this point in the proceedings, Father's whereabouts were unknown. At the 12-month review hearing on May 6, 2015, Mother provided contact information for Father, who was living in Mexico. The parties stipulated to Mother receiving further services, and an 18-month review hearing was set for August 6, 2015. The juvenile court ordered SSA to use its best efforts to contact Father.

In its report for the 18-month review hearing, the social worker again recommended terminating services and setting a permanency placement hearing. Mother's participation in services was only moderate. Y.G. remained firmly bonded with the foster parents. Y.G. was "happy and healthy" in her placement, continued to express that she wanted to remain with the foster parents and be adopted by them. Mother had little interaction with Y.G. during visits, and Y.G. would remain in close proximity to the foster parents. Y.G. was doing well in school and in extracurricular activities. Y.G. had no recollection of Father. The 18-month review hearing was continued to August 10, 2015.

On August 10, 2015, Father filed a section 388 petition asking the court to return Y.G. to his care in Mexico, or to grant him reunification services, and asked for

5

presumed father status. The juvenile court granted Father's request for presumed father status but denied the section 388 petition without a hearing, finding he had not established a prima facie case. The court observed Father had not demonstrated a change of circumstances or that changing the prior orders was in Y.G.'s best interests. (This ruling was affirmed in our prior opinion *S.S. v. Superior Court*, *supra,* G052432.) The trial court proceeded to the 18-month review hearing, terminated reunification services, and scheduled a permanency hearing.

Social worker, Khac Quy T Nguyen, prepared a report for the permanency hearing and recommended the court terminate parental rights and free now six-year-old Y.G. for adoption. Nguyen opined Y.G. was likely to be adopted based on her characteristics and attributes. "[Y.G.] is a happy, athletic, loveable, girl who is developmentally on track. [She] is currently placed in a concurrent planning home that wishes to adopt her. The caregivers and the child have developed a warm, loving bond [and she has lived with them nearly two years, since February 8, 2014]. [She] has adjusted, adapted, and assimilated well with the adoptive family."

Nguyen reported the prospective adoptive parents were providing Y.G. a loving and stable home. Y.G.'s caregivers had "developed a strong attachment to and an unwavering love" for her, and they have "worked diligently to integrate [Y.G.] into their lives by modifying their daily schedules to meet her needs and include her in various extended family functions and activities." After being in their care for nearly two years, Y.G. called the caregivers "Mommy" and "Daddy."

During a home study visit, Y.G. appeared happy and comfortable with her caregivers, and she looked to them for her needs to be met, for guidance, and for reassurance. Y.G. was very shy and soft spoken. Although Y.G. did not understand what the term "adoption" meant, she said "I like it" when asked how she felt about living with the prospective adoptive parents. She indicated there was nothing she did not like about living with them. The prospective adoptive mother reported she had been discussing the

6

idea of adoption with Y.G. and believed Y.G. would benefit from counseling services to address adoption related issues. Y.G. asked when her name could be changed to match the last name of the prospective adoptive parents.

With respect to the parent-bond exception, Nguyen reported the quality and nature of Mother's visits had declined over the course of the dependency proceedings. Mother never advanced beyond supervised visits, twice a week for three hours per visit. She frequently arrived late, and cancelled and rescheduled visits.

Nguyen stated Y.G. appeared comfortable with Mother early in the proceedings. She called out for her attention and would cry at the end of visits. Mother sometimes brought food and gifts. She played and interacted appropriately with Y.G.

However, over time, Nguyen observed there was less verbal interaction between Y.G. and Mother, and Y.G. sought "close proximity" with her caregivers during visits. It was reported, "[Mother] often expresse[d] feeling tired and does not generally initiate play activities with [Y.G.] during the visit." Consequently, Y.G. "often brings coloring [or] activity book[s] or plays on her tablet during the visits." Y.G. sometimes refused to speak with Mother over the telephone.

In late August 2014, Y.G. got emotional toward the end of a visit, stating she wanted to go home to her foster mother. In April 2015, her caregiver reported Y.G. did not want to go to visits, asking, "'Do I have to go, Mommy?'" The caretaker explained that although she brings puzzles or a tablet, and Mother brings items for Y.G., the "verbal engagement" between Y.G. and Mother was limited and Y.G. appeared bored during visits. Y.G. appeared to prefer speaking with her foster mother during visits than with Mother. During one visit Mother made an inappropriate comment, questioning Y.G. if she would rather go home with her. Y.G. became "anxious and worried" she could no longer live with her caregivers. Nguyen opined that although Mother continued to visit Y.G., there "has been limited parent/child bonding and [Y.G.] has not displayed any

7

affection toward [Mother] and it has been typical of [Y.G.] not to respond to [Mother] with physical gestures."

At the hearing, the court considered Mother's testimony. She stated she visited Y.G. regularly and tried to call, text, and FaceTime with Y.G. several times a week. She maintained Y.G. was affectionate with her, and would hug her at the start and end of visits. She recalled when Y.G. would cry at the end of visits and ask if she could go home with Mother. Mother explained she cancelled some visits when she was sick to make sure Y.G. would not get sick. She admitted cancelling other visits due to work or lack of finances. She stated she always made up the visits.

Mother stated she brought educational books and games during visits, and during visits they would often eat, play, do homework, and read books together. Y.G. called her "Mom," and they frequently talked about what was going on in Y.G.'s life. Mother believed Y.G. looked to her as a parent and not just a visitor. Y.G. sought Mother's comfort when she was feeling sick or when they read a book together. Mother stated it would be detrimental to Y.G.'s emotional health if they no longer spent time together.

The court terminated Mother's parental rights. It noted, "[I]f the test were one of Mother's—solely [Mother's] love for the child, the issue would be easy—easily resolved in Mother's favor." However, the court recognized the law required more than evidence of motherly love and sacrifice. It noted a court must determine the extent "the relationship promotes the child's well-being" and balance the quality of the parent-child "relationship in a tenuous placement against the security and sense of belonging a new family would confer." The court determined the parental bond exception to terminating parental rights did not apply in this case, and because the child was adoptable and likely to be adopted, the court terminated Mother's parental rights. It deemed adoption to be Y.G.'s permanent plan.

8

II

Mother contends the court erred in finding the benefits of continuing the parent child relationship did not outweigh the benefits of adoption. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) We apply a hybrid standard of review to the juvenile court's determination. We review for substantial evidence and determine whether the trial court abused its discretion.[2] (*Ibid.*) "Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption. [Citation.]" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)

To establish the parental bond exception, Mother first had to demonstrate she maintained regular contact with Y.G. (§ 366.26, subd. (c)(1)(B)(i).) Once that was established, she had the burden of demonstrating Y.G. would benefit from continuing the relationship to an extent that outweighed the benefits of adoption. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) She had to show that severing "the natural parent-child relationship would deprive [Y.G.] of a *substantial*, positive emotional attachment such that the child would be greatly harmed. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

The Orange County Social Services Agency (SSA) did not contest Mother met the first prong and the juvenile court did not discuss it. Indeed, the evidence supports the conclusion Mother maintained regular contact with Y.G. However, it was the limited nature of, and sometimes poor quality of, these visits that was relevant to the second

---

[2]   "The practical differences between the two standards of review are not significant. '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . ."'" [Citations.] (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*).)

9

prong. Although early in the proceedings Y.G. was excited and happy to see Mother, this changed over time. Their verbal and physical interactions became limited, and it appeared Y.G. preferred to speak with and interact with her caregivers. Mother often shortened visits and they never progressed past supervised visitation.

Y.G. referred to Mother as "mom," but she also referred to her caretakers as "mommy" and "daddy," and actively sought out their affection and support. She stated it was her preference to live permanently with them and she wished to change her last name to match theirs. There was evidence Y.G. no longer wanted to go to visits with Mother, asked to end a visit early, and had strained interactions with Mother during visits. She became anxious when Mother jokingly suggested Y.G. come home with her. It cannot be overlooked that Y.G. had been verbally and physically abused by Mother in the past, and the evidence clearly suggests she no longer wanted Mother as her primary caregiver. All the above is strong evidence from which it can reasonably be inferred terminating parental rights would not be detrimental to Y.G.

Mother failed to meet her burden of showing Y.G. would benefit from continuing the relationship such that her adoption was precluded. Mother's relationship with Y.G. did not establish the sort of consistent, daily nurturing that marks a parental relationship. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) The beneficial relationship exception requires more than a showing that the parent has maintained frequent and loving contact with the child, that the two share an emotional bond, or that the parent was more than a friendly adult visitor. (See, e.g., *Jasmine D., supra*, 78 Cal.App.4th at p. 1350; *Derek W., supra,* 73 Cal.App.4th at pp. 826-827.) A parent cannot "derail an adoption merely by showing the child would derive some benefit from continuing a relationship." (*Jasmine D.*, *supra,* 78 Cal.App.4th at p. 1348.) Indeed, "continued interaction between the biological parent and child will almost always confer some benefit on the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811.)

10

Mother argues her case is like that of *In re Amber M.* (2002) 103 Cal.App.4th 681, 690 (*Amber M.*), in which the appellate court held the juvenile court erred in failing to apply the exception. In that case, application of the exception was supported by substantial and specific testimony. "The common theme running through the evidence from the bonding study psychologist, the therapists, and the CASA is a beneficial parental relationship that clearly outweighs the benefit of adoption." (*Ibid.*) In the case before us, there is no comparable testimony, bonding study, or circumstantial evidence, other than Mother's self-serving statements. Very telling is Y.G.'s expressed desire to end visits with Mother and be adopted. The *Amber M.* case is inapplicable.

Mother also contends that the present case is similar to *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*). There, although S.B.'s father had "'complied with every aspect of his case plan,'" physical and emotional health issues prevented him from reunifying with her. (*Id.* at pp. 293-294.) The juvenile court terminated his parental rights, finding that although father maintained frequent and loving contact with S.B. and they shared an emotionally significant relationship, there was no evidence to suggest that the relationship was parental in nature or that it would be greatly detrimental to S.B. to terminate her relationship with her father. (*Id.* at p. 296.) The appellate court reversed, noting a bonding study described the bond between father and child as "'fairly strong'" and opined there was a potential for harm to the child if she were to lose the parent child relationship. (*Id.* at p. 295.) Father was S.B.'s primary caregiver for three years and after her removal, she continued to display a strong attachment to him. They shared an affectionate relationship, and S.B. said she loved and missed Father. She wanted their relationship to continue and she wished they could live together. Based on this record, the court concluded the only reasonable inference was that S.B. would be greatly harmed by the loss of her significant, positive relationship with her father. (*Id.* at p. 301.)

11

Unlike the father in the *S.B.* case, Mother physically and emotionally abused Y.G. and she had not complied with her case plan. And as stated above, there was no evidence of a strong primary attachment or a potential for harm if Y.G. were to lose the parent child relationship. Y.G. was thriving and happy living with the prospective adoptive parents. She wanted to be adopted and exhibited anxiety about having to leave them. During visits with Mother, Y.G. appeared board and she often wanted to go home. She sought close proximity to her caregivers during visits and asked if she had to attend future visits. This conduct is not indicative of a six-year-old child who would suffer any detriment if the visits were to stop.

The juvenile court could reasonably conclude the permanency of adoption outweighed any benefit Y.G. might gain from continuing her relationship with Mother. (*Jasmine D., supra*, 78 Cal.App.4th at p. 1348.) Guardianship, the plan Mother advocates on appeal, "'is not irrevocable and thus falls short of the secure and permanent future'" intended by the Legislature. (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) "Adoption is the Legislature's first choice because it gives the child the best chance at [a full] commitment from a responsible caretaker." (*Jasmine D., supra*, 78 Cal.App.4th at p. 1348.)

On a final note, we are not persuaded by Mother's argument it would be somehow unfair to terminate her parental rights because she willingly reached out for help from SSA. She argues it was a "courageous act of love" to give up Y.G. for the child's protection. And this selfless act "is the true meaning of motherhood." Apparently she seeks to factually distinguish an abused and neglected child detained due to "love and concern" of the abuser from one detained over the parent's objections. As the trial court stated, if the test was related to the degree of motherly love, the outcome of this case would be different. However, the objective of the dependency scheme is not to reward parents for loving their child. "The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide

12

permanent, stable homes if those children cannot be returned home within a prescribed period of time." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 307.)  When reunification efforts have failed, "*the focus shifts to the needs of the child*."  (*Id.* at p. 309, italics added.)  The record discloses no basis for the court to suspect Y.G. had needs that could only be met by Mother or, that the relationship outweighed the security, belonging, and love offered by the family who wished to adopt her.  We conclude the juvenile court did not error in concluding the parent child beneficial relationship exception inapplicable.

III

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.

13